**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | Criminal No. 04-233 |
| | ) | Electronically Filed |
| CLARENCE M. GREEN, JR., | ) | |
| | ) | |
| Petitioner. | ) | |

## MEMORANDUM OPINION ON PETITIONER'S MOTION TO VACATE SENTENCE (DOC. NO. 134)

Before the Court is the Motion of Petitioner, Clarence M. Green Jr., to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody under 28 U.S.C. § 2255 ("Motion to Vacate") (Doc. No. 134), a Brief in Support (Doc. No. 135), a Supplemental Brief (Doc. No. 154), and the Government's Response. Doc. No. 168.

### I.    Background

On December 14, 2005, a jury found Petitioner, Clarence M. Green, Jr., guilty of all six counts of an indictment charging him with, among other things, possession with intent to distribute various controlled substances and possession of a firearm by a convicted felon. The indictment charged that on July 22, 2004, Mr. Green possessed with the intent to distribute more than 5 grams of crack, less than 500 grams of cocaine, and the carrying and possessing of a firearm in furtherance of these drug trafficking crimes. In addition, the indictment charged that on February 2, 2005, he possessed with the intent to distribute less than 5 grams of crack, and possessed with the intent to distribute less than 500 grams of cocaine.

Following his jury trial, on July 7, 2006, this Court sentenced Mr. Green to a term of 360 months imprisonment[1] followed by a 5-year term of supervised release. On July 14, 2006, Mr. Green appealed his conviction and sentence to the United States Court of Appeals for the Third Circuit. Doc. No. 113. The Court of Appeals issued an Opinion affirming Mr. Green's conviction (see doc. no. 133-2), and on October 31, 2007, the Court of Appeals affirmed this Court's July 7, 2006 Judgment sentencing Mr. Green to 360 months of imprisonment. Doc. No. 132.

On January 29, 2009, Mr. Green filed a *pro se* Motion to Vacate his sentence under 28 U.S.C. § 2255. Doc. No. 134. On August 16, 2010, counsel for Mr. Green offered a supplement to the original Motion to Vacate. Doc. No. 154.

In the Supplemental Motion to Vacate, counsel for Mr. Green clarified six grounds[2] upon which Mr. Green's sentence should be vacated. Each of the grounds was predicated upon the alleged ineffectiveness of trial counsel as follows: (1) in failing to conduct a reasonable investigation; (2) in failing to object to and in permitting the admission of prejudicial evidence of Mr. Green's other crimes/convictions, Mr. Green's fugitive status, and the fraudulent use of his brother's identification; (3) in allowing alleged inadmissible hearsay which rebutted Mr. Green's defense that the police had a motive to frame him; (4) in failing to challenge this Court's jury instruction on 18 U.S.C. § 924(c); and (5) the accumulated prejudice of each of the ineffective counsel claims.

---

1 This Court sentenced Mr. Green to the lowest end of the advisory guideline range which suggested imprisonment from 360 months to life.

2 One of the six grounds was abandoned by Petitioner during the course of the proceedings and thus, this Court will only address the remaining five grounds.

## II.        Motion to Vacate – The Evidentiary Hearing

When a Petitioner brings a motion to vacate sentence pursuant to Section 2255, the district court has discretion whether to conduct an evidentiary hearing. *United States v. Lilly*, 536 F.3d 190, 195 (3d Cir. 2008) (citing *United States v. Booth*, 432 F.3d 542, 545 (3d Cir. 2005)). However, the District Court is required to hold an evidentiary hearing on a motion to vacate sentence unless the motion and files and records of the case show conclusively that the movant is not entitled to relief. *Id.* (citing *Gov't of Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989)). This is not a high bar for a movant to meet, especially since the Court, in considering a Section 2255 claim, "'must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record.'" *Id.* (quoting *Forte*, 865 F.2d at 62); see also Rules Governing § 2255 Proceedings, Rules 4 and 8.

Thus, a Section 2255 Motion "'can be dismissed without a hearing [only] if (1) the [movant's] allegations, accepted as true, would not entitle the [movant] to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" *United States v. McCoy*, 410 F.3d 124, 134 (3d Cir. 2005) (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995)). A district court's decision not to hold an evidentiary hearing may be reversed for abuse of discretion if "the files and records of the case are inconclusive on the issue of whether [the] movant is entitled to relief." *Id.* at 131 (citing *Solis v. United States*, 252 F.3d 289, 294-95 (3d Cir. 2001)).

Based on the above cited law, the Court in the instant matter determined that a hearing was necessary and held the hearing on April 26, 2012 (hereinafter, "Section 2255 hearing"). During the hearing, Mr. Green's attorney presented testimony from seven witnesses as well as

testimony from Mr. Green and Mr. Green's trial counsel, Mr. Stanton Levenson.

Each witness testified to his or her own personal knowledge of the events that transpired on the night Mr. Green was arrested, and/or his or her knowledge of the relationship between Mr. Green and Ms. Mia Covington, the estranged wife of one of the police officers involved in Mr. Green's arrest on the night in question. In addition, each witness indicated that he or she was never interviewed by Mr. Levenson nor subpoenaed to testify at Mr. Green's trial.

Mr. Green testified that he had supplied the names of each of these witnesses to Mr. Levenson, his trial counsel. Mr. Green testified that Mr. Levenson represented to him during the trial that these witnesses were interviewed and subpoenaed, but simply did not show up for trial. He also indicated that he had supplied his trial counsel with four photographs of Ms. Covington, two of which depicted her in Mr. Green's residence, one depicted her in a hot tub with Mr. Green, and one photograph depicted her with Mr. Green and other people. None of these were proffered by Mr. Green's trial counsel at his trial, and of these four photographs, the only photograph that could be located and proffered during the Section 2255 hearing was the group photo which depicted Ms. Covington with Mr. Green and other individuals.

Mr. Levenson testified, but he could not recall: (1) whether he had actually interviewed the seven witnesses who testified at the Section 2255 hearing; (2) whether Mr. Green had given him the names of the Section 2255 witnesses (although he did recall that at the time of trial, Mr. Green had given him names of various witnesses to interview); and (3) whether the aforementioned photographs depicting Mr. Green and Ms. Covington together were used at trial. Mr. Levenson testified that he did recall meeting with Mr. Green before trial, discussing the testimony he would elicit from Mr. Green during trial, and receiving one or more photographs from Mr. Green.

### III. Standard of Review – Ineffective Assistance of Counsel

As noted above, in this case, Mr. Green advanced five arguments in support of his ineffective assistance of counsel claim. The standard for deciding an ineffective assistance of counsel claim is that set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to succeed on an ineffective assistance of counsel claim, a petitioner must show: (1) that his or her counsel's performance was deficient, and (2) that he or she was prejudiced by it. *Lilly*, 536 F.3d at 195 (citing *Strickland*, 466 U.S. at 687). The United States Court of Appeals for the Third Circuit has "endorsed the practical suggestion in *Strickland* to consider the prejudice prong before examining the performance of counsel prong 'because this course of action is less burdensome to defense counsel.'" *Booth*, 432 F.3d at 546 (quoting *McCoy*, 410 F.3d at 132 n.6).

Under the first prong of the *Strickland* test, "an attorney renders ineffective assistance when his performance 'f[alls] below an objective standard of reasonableness,' given the particular circumstances of the case at hand." *Hodge v. United States*, 554 F.3d 372, 379 (3d Cir. 2009) (quoting *Strickland*, 466 U.S. at 688). In reviewing counsel's performance, the court must be "highly deferential," which entails "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689 (quoted in *United States v. Hankerson*, 496 F.3d 303, 310 (3d Cir. 2007)). In other words, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quoted in *Hankerson*, 496 F.3d at 310). To rebut this presumption, the movant "must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel, or (2) that the actions could never be considered part of a sound strategy." *Thomas v. Varner*, 428 F.3d 491, 499 (3d Cir. 2005). However, the reviewing

court may not, "with the benefit of hindsight, [] engage in speculation about how the case might best have been tried." *Hess v. Mazurkiewicz*, 135 F.3d 905, 908 (3d Cir. 1998).

Under the prejudice prong of the *Strickland* test, the movant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is 'a probability sufficient to undermine confidence in the outcome.'" *Hankerson*, 496 F.3d at 310 (quoting *Strickland*, 466 U.S. at 694). Accordingly, the movant will not be entitled to relief "unless [he or she] affirmatively establishes the likelihood of an unreliable verdict." *McAleese v. Mazurkiewicz*, 1 F.3d 159, 166 (3d Cir. 1993).

The development of precedent within the Court of Appeals for the Third Circuit in other factual settings under Section 2255 illustrates the distinction between situations requiring and not requiring an evidentiary hearing. Compare *United States v. McCoy*, 410 F.3d 124 (3d Cir.2005) (reversing denial of Section 2255 petition and remanding for evidentiary hearing where petitioner alleged that counsel's advice to stipulate at trial to a fact that could support *mens rea* element constituted ineffective assistance); *Solis v. United States*, 252 F.3d 289 (3d Cir.2001) (vacating and remanding for hearing in Section 2255 case where petitioner alleged that he instructed counsel to file a direct appeal but counsel did not file; potential factual dispute existed because the files and records did not show conclusively that petitioner was not entitled to relief); with *United States v. Lilly*, 536 F.3d 190 (3d Cir.2008) (affirming denial of evidentiary hearing in Section 2255 case where petition alleged that counsel failed to properly advise regarding the right to jury trial when petitioner waived that right and proceeded to nonjury trial; no prejudice shown because evidence was more than sufficient for judge or jury to find guilt); see also *Palmer v. Hendricks*, 592 F.3d 386 (3d Cir. 2010) (affirming denial of evidentiary hearing in Section

2254 case under AEDPA, where petitioner had requested and been denied hearing in state court, and claim was that counsel had failed to advise him of his right to testify at trial, but petitioner failed to allege prejudice adequately because he did not specify what he would have testified other than that he had a theory of self-defense).

IV.     **Findings of Fact**

1.      The testimony offered by the seven witnesses during the Section 2255 hearing was duplicative of testimony and evidence proffered by trial counsel at trial.

During the Section 2255 hearing, Mr. Green's current attorney called six witnesses to testify on Mr. Green's behalf, and the testimony of these seven witnesses will be addressed in turn.

a.      **Ms. Annette McHenry** testified during the Section 2255 hearing that she was in Ficklin's Bar on the night in question playing a video game. Doc. No. 220, p.7, 13-14. She testified that she saw Mr. Green walk into the bar when two men (police officers) came up behind him in the bar vestibule and immediately threw Mr. Green against the wall. Id. at p. 7. She did not see Mr. Green with either a gun or drugs, nor did she see him throw anything. Id. at p. 9. She did not believe he would have had a chance to do so because he was thrown against the wall immediately upon his entering the bar. Id. Although Ms. McHenry did not directly testify as such, it could be reasonably inferred through her testimony that the police officers planted evidence (drugs and/or the gun) on Mr. Green.

Ms. McHenry's account of what transpired as the police officers detained Mr. Green in the bar that night mirrors the testimony of Ms. Joyce Massengill, who testified on Mr. Green's behalf during trial. Ms. Massengill testified that she was in Ficklin's Bar on the night in question, and she stated that she witnessed Mr. Green walk through the bar door, and seconds

later was pinned to the wall by a police officer. She too implied that evidence was planted by the police officers. To this end, Ms. Massengill testified as follows in response to Mr. Levenson's questions:

> Q. Now, at some point did you see Clarence Green enter the bar?
>
> A. Yes, I did.
>
> *   *   *
>
> Q. Do you recall how he was dressed?
>
> A. Very elegant, as always. But, I mean, just very nicely. The girls were like laughing and saying something to him. And I looked over and I seen him come in, and I don't think it was five seconds before all of a sudden you hear all of this commotion and this white guy, big guy, threw him up against the wall.
>
> *   *   *
>
> Q. How long was he in the bar before this other gentleman came in?
>
> A. Honestly, I don't think it was five seconds.
>
> *   *   *
>
> Q. Okay. Will you describe what you saw.
>
> A. Yes, I will. There was four men, one black man, three white men, and the big white guy threw him up against the wall and asked these other two guys to cuff him. And the black guy was standing at the door like he was guarding the door or something.
>
> *   *   *
>
> Q. Okay. Now, once Mr. Green was handcuffed, you said that they pulled up his shirt?
>
> A. Uh-huh.
>
> Q. Now, who did that?

A. The big cop.

Q. Okay. What else did you see him do?

A. Pull down his pants.

Q. Pull down his pants how far?

A. You could see his -- he had on boxer shorts, they were blue and white. And you could actually see, well, his pubic hairs.

Q. Okay. What did you see this officer or these officers do to Mr. Green?

A. Oh, it was like throwing him up against the wall and he said, stay right there. And so this big guy all of a sudden where I was sitting, he start, he came around and went up under --

Q. Let me stop you before you do move on. Were you able to observe what they were doing to Mr. Green in terms of pulling up his shirt --

A. They were searching him. They made him take off his shoes. I mean --

Q. Now, did you observe them find anything on his person?

A. No. They did not.

Q. What happened after that?

A. After that, I mean, they found nothing. This big guy was, he went around to the kitchen part and he was like searching, looking for something. And while all of this activity was -- the other guys was watching Mr. Green, this black guy, I don't know him, I have seen him in Ficklin's before, he's short, he had on motorcycle gloves and cowboy boots, he threw something up under, behind the kitchen, in his sleeve. It was a gun. I seen it.

Q. Now, when you made that observation, where was Mr. Green?

A. He was still handcuffed. He was --

Q. Okay. This individual that you have described, you
Don't know his name?

A. All I know is they call him Meaty, Meatball, I don't
know. It's Meat something. I really don't know.

Q. So he was someone you didn't know?

A. No, I did not know him.

Q. Have you seen him before?

A. Yes, I have.

Q. Other than describing him as short, dark skinned and
wearing driving gloves and cowboy boots, is there anything
else you can remember about his appearance?

A. No, just dark skinned.

Q. Now, did you see anybody retrieve that gun from the
kitchen?

A. Uh-huh.

Q. Who did you see retrieve it?

A. That big, tall white guy.

Doc. no. 128, pp. 32-37.

On cross-examination, Ms. Massengill clarified her testimony concerning her belief that

the police planted evidence as follows:

Q. Where was the officer searching? Was he inside the
kitchen?

A. He was all around this area.

Q. So he was in this general area?

A. Uh-huh.

Q. That's a very small area, isn't it?

A. I guess so. Yes, it is. It seems very small.

Q. And your testimony, if I understand you correctly, is
that an African American male who is short, wearing motorcycle
gloves and cowboy boots, while the officer is in this small
area searching somehow threw the gun in the kitchen area?

A. I seen him throw it. I seen him.

Q. And none of the police officers saw him?

A. I don't know what they seen. I seen him.

Q. So you saw this man come into this tight area with four
police officers and the Defendant, and did he toss the gun
over the bar or did he come around the side?

A. I don't know how he did it. He slid it.

Q. I am sorry, I thought you said you saw him.

A. He slid it. I am telling you, he slid it. But what I
am saying is the other officers, you are saying four officers,
the other two, the one guy was at the door and the other two
were with Mr. Green.

Q. Yes, ma'am. In this area, is that correct?

A. Yeah.

Q. And when you said he slid it, this bar, that's for food
service, is that correct?

A. Uh-huh.

Q. That's solid, it is a solid bar, correct?

A. I have no idea if it is solid or not. I can only tell
you what I seen him do.

Q. Let me see if I have a photo. This is Government's 2A.
This is the base of that bar. That's solid there, is that
correct?

A. Yeah.

Q. In fact, it is solid around the front of it as well?

A. Okay.

Q. So did he -- my question is, did he slide it over the
bar or did he come around and slide it in the open area?

A. Let me tell you something right now. He came around.
All the emphasis was on Mr. Green and I am telling you, I know
what I seen.

Q. Yes, ma'am. So your testimony is that he came around
the solid bar and slid the gun into the kitchen?

A. And this guy, the cop, bent down and said, Clarence,
this is your gun.

Q. After seeing this man --

A. I don't know what he seen.

Q. And the African American --

A. I know what I seen.

Q. Excuse me, ma'am. And the African American police
officer was standing at the doorway?

A. (Witness nods head). Yes, sir.

Id. at pp. 42-44.

Given Ms. Massengill's testimony, the Court finds that Ms. McHenry's testimony would

have been duplicative if it had been offered at trial.  Ms. McHenry's testimony offers no new

evidence that the jury did not already have at its disposal.

      **b.**     **Ms. Wilhelmenia Smith** testified during the Section 2255 hearing that she

was working in Ficklin's Bar on the night in question.  Doc. No. 220, p. 21.  Her testimony

provided the same account of events that Ms. McHenry and Ms. Massengill provided.  Id. at p.

22-25.  Specifically, she said she saw Mr. Green enter the bar and within seconds, while he was still in the vestibule area, he was grabbed by police officers and slammed against the wall.  Id. at p. 22-23.  She too indicated that a white police officer searched the kitchen area and, after stooping down, came up and said he found a gun.  Id. at p. 23-24.

As set forth above, the trial testimony of Ms. Massengill provided the jury with the same information that Ms. Smith proffered during the Section 2255 hearing, and thus, Ms. Smith's testimony would have been duplicative and would not have offered any new information for the jury to consider.

        **c.**     **Ms. Rebecca Satterwhite** testified during the Section 2255 hearing that she was sitting in her car outside of Ficklin's bar on the night in question.  Doc. No. 220, p. 35.  She testified that she observed Mr. Green enter Ficklin's and shortly thereafter saw an unmarked police car speeding by and stopped short in front of the entrance to the bar.  Id. at p. 35.  She testified that two policemen got out of the vehicle and ran into the bar.  Id.  She testified that she saw Mr. Green emerge from the bar in handcuffs.  Id.  She testified that she saw a white police officer take the clip out of a handgun and then place the handgun in Mr. Green's handcuffed hands.  Id.  She also said that she observed a black police officer open the trunk of the unmarked police car and watched while he pulled a plastic baggie out of a black duffel bag sitting in the car's trunk.  Id. at p. 36.  She said this same officer then placed the baggie in Mr. Green's pants.  Id.

The Court finds that Ms. Satterwhite's testimony provides the same information as the testimony proffered by Stephanie Lynne Dickey, who testified during the trial on Mr. Green's behalf.  On direct examination, Ms. Dickey testified that she was sitting in Ms. Satterwhite's car with Ms. Satterwhite on the night in question.  Doc. No. 128, p. 48.  The other, relevant portions

of her trial testimony are as follows:

Q. Now, where had you been earlier that evening?

A. Earlier that evening I was at dinner with a friend of mine's and we were at Houhilan's in Station Square.

Q. Your friend's name?

A. Eyona.

\* \* \*

Q. What did you do after dinner?

A. We drove around, had a couple stops to make, then I was going over to pick my car up in front of [Mr. Green's] mother's house and it wasn't there. So I had called him to find out where I needed to come and get my car.

Q. Where was your car?

A. It was at Ficklin's in the parking lot is where I went to go pick it up at.

Q. Why was it there?

A. That's where he had drove it down. I guess he had someone follow him down because he had to go to work.

Q. When you say he, do you mean Clarence Green?

A. Yes, Clarence.

\* \* \*

A. I had called him on the phone and I asked him where to come and pick my car up. And he told me that it was at Ficklin's Bar, but that he was looking for his supervisor's keys. So that's when he asked me if I can go and pick her up and bring her over with her set of keys.

Q. The supervisor was this Rebecca Satterwhite you already spoke about?

A. Correct.

\*   \*   \*

Q. All right. Now, he asked you to pick her up?

A. Yes.

Q. Why is that?

A. To bring her over with her set of keys because he
Couldn't find them.

Q. He had lost the keys to her car?

A. Correct.

\*   \*   \*

Q. So what happened next?

A. After that, I picked her up and then we came over to
Fifth Avenue, Ficklin's Bar. Eyona dropped me off and she
left. Then we were sitting in the car just talking briefly.

Q. Let's slow down.

A. Okay.

Q. So Eyona drove you and Becky Satterwhite to Ficklin's,
correct?

A. Correct.

Q. And Becky Satterwhite's car was where?

A. Her car was parked on the street on Fifth Avenue, right
before the parking lot on Fifth Avenue.

\*   \*   \*

Q. How is Rebecca Satterwhite able to get in her car?

A. She had her set of keys. She had her extra set.

Q. Now, as you and Ms. Satterwhite were sitting in her
car, did you see Clarence Green?

A. He was walking up Fifth Avenue on the same side of Ficklin's.

Q. Coming toward you?

A. Correct.

*   *   *

Q. Did you see him enter Ficklin's?

A. Yes, I did.

Q. After he entered Ficklin's, did you see anybody else go in?

A. Well, after he had entered Ficklin's, we were sitting when an Impala, a dark Impala had came down Fifth Avenue and it was like they came to a screeching halt and there were three white police officers and one black police officer jumped out and they went into Ficklin's and they were like, hey, hey, but I didn't know who they were talking to.

Q. Did you think they were going in after Mr. Green?

A. No, I did not.

Q. When did you next see Mr. Green after he entered the bar?

A. It was maybe about 10 or 15 minutes later he had came out in handcuffs.

Q. Were his hands cuffed behind his back?

A. Yes, they were.

Q. What did you see when he was brought out of the bar?

A. When he was brought out, one thing that I did notice was that he didn't have tennis shoes on, which he was walking out barefoot. He had socks on, but he didn't have any shoes on. They had him up against the wall facing Fifth Avenue.

Q. Okay. This would be on the same side of the street that Ficklin's was on?

A. Correct.

Q. Now, while he was out there with these police officers with his hands cuffed behind his back did you see any of those officers play with a gun?

A. Yes, I did.

Q. How would you describe the officers you described playing with a gun?

A. The thing that distinguished him different from everybody else is he was taller, he was bigger, he had dark hair, and he was the one playing with the gun.

Q. Was he a white police officer or African American?

A. He was a white police officer.

Q. Did you know him? Had you ever seen him before?

A. No.

Q. And what did you see him do with that gun?

A. Well, he was like, he was taking the clip out the gun, then basically he was grabbing it by the barrel and had the handle and it was like he was trying to shove it in Mr. Green's hand.

Q. As he was trying to shove the gun into Mr. Green's hand, were you able to hear him say anything?

A. Yes, I did.

Q. What did he say?

      MR. BRADY: Objection, Your Honor, hearsay.
      THE COURT: Overruled.

THE WITNESS: I heard him say, we have your monkey ass now.

BY MR. LEVENSON:

Q. We have your monkey ass now?

A. Yes.

Q. Did you witness any other police officer doing anything unusual at that time?

A. Yes, the African American police officer had went to the trunk of the car and he pulled out a dark colored bag.

Q. Now, when you say he went to the trunk of the car, which car was that?

A. The Impala, the dark Impala they were all in. He went to the trunk. He pulled out the dark bag. And, I mean, it looked like it might have been about this size bag (indicating), and he took another plastic bag out of that bag and he was walking toward Mr. Green.

Q. Did you see him do anything?

A. Yes. What he was trying to do is he was trying to put it down in the front of his pants; and when he was trying to put that in, it looked like maybe something fell to the ground because he went down to try to pick up whatever it was that he put in there, but it was like they were searching him all over again.

Q. The events that you witnessed in front of Ficklin's that you just described for us, can you estimate how long a period of time that was?

A. I would say that they probably did that, maybe it was, about between five and ten minutes.

Q. All right. Eventually did a police wagon arrive and take Clarence away?

A. Yes, a paddy wagon did come.

Q. You were still in the car and you witnessed that?

A. Yes.

Doc. No. 128 at p. 48-56.

Because Ms. Dickey was seated in Ms. Satterwhite's vehicle with Ms. Satterwhite on the night in question, and because she testified to observing the same events from the same vantage point as Ms. Satterwhite did during the Section 2255 hearing, the Court finds that Ms. Satterwhite's testimony would have been duplicative of Ms. Dickey's if it had been offered at trial. Ms. Satterwhite's testimony offers no new evidence that the jury did not already have at its disposal during the trial.

      **d.**      **Mr. Gerald Brown** appeared live at the Section 2255 hearing to testify on Mr. Green's behalf, **and Mr. Gary Lee** testified via a live video feed from prison during the Section 2255 hearing. Both individuals testified with regard to the alleged relationship between Ms. Covington and Mr. Green.

Mr. Lee testified that he knew Ms. Covington from childhood having grown up in the same housing project with her in Pittsburgh's North Side. Doc. No. 220, p. 51. Mr. Lee also testified that he personally saw Ms. Covington and Mr. Green together from 1999 through 2001 at various bars in Pittsburgh. Id. He testified that he observed them acting like "a couple" – in other words like a boyfriend and girlfriend. Id. at p. 52-53. Mr. Lee also stated that when he asked Mr. Green about his relationship with Ms. Covington he stated that she was "his girl" or "his piece." Id. at p. 53.

Like Mr. Lee, Mr. Brown testified that he had seen Mr. Green and Ms. Covington sitting together at bars and described their relationship as romantic. He also testified that Mr. Green brought Ms. Covington to his house and they all had drinks in Mr. Brown's hot tub.

It is clear that the testimony of Mr. Lee and Mr. Brown would have been used to bolster the Defendant's theory that Mr. Green had a relationship with Ms. Covington, the estranged wife

of one of the police officers. In addition to this testimony supporting a factual finding that Mr. Green and Ms. Covington had a relationship, Mr. Green also testified during the Section 2255 hearing that during the trial his attorney failed to present a photograph of Ms. Covington, half-clad, lying on his bed in his home. Mr. Green was unable to produce that photograph during the Section 2255 hearing, claiming he could not locate it, although he did present another photograph of himself, and others, posing with Ms. Covington.

The Court finds that the testimony of Mr. Lee and Mr. Brown provides no credible evidence that the jury did not hear from Mr. Green concerning whether there was a relationship between Mr. Green and Ms. Covington. In addition, Mr. Green's trial attorney cross-examined the police officers concerning their knowledge concerning the relationship between Mr. Green and Ms. Covington. The police officers, who had any knowledge concerning the alleged relationship, testified that Ms. Covington denied having a relationship with Mr. Green and/or that Ms. Covington claimed that Mr. Green approached her and asked her to lie and say they did have a relationship.

Ms. Covington was not called to testify by Mr. Green's trial counsel at the trial, nor was she called by Mr. Green's counsel at the Section 2255 hearing. Despite her absence from the trial, Mr. Green's attorney clearly advanced the "my-client-was-framed-in-retaliation-for-having-a-relationship-with-a-police-officer's-estranged-wife" theory during the trial. The relevant trial testimony in this regard is as follows:

### 1. Mr. Clarence Green – direct examination

Q. Now, at some point after your release from this sentence were you arrested again?

A. Yes, I was.

Q. Do you recall when that was?

A. I think it was 2001 maybe. I am not positive what year it was.

Q. Were any of the officers who were involved in this case involved in that arrest?

A. Yes, they were.

Q. Which of them?

A. Officer Brock Covington, Officer Klahre, and --

Q. Officer Norman Klahre?

A. Yes, sir.

Q. Okay.

A. And I can't think of the other two officers' names.

Q. What were you arrested for?

A. Pardon me?

Q. What were you arrested for?

A. Possession and attempt.

Q. Of what?

A. Of narcotics.

Q. What kind of narcotics?

A. Cocaine.

Q. What was the result of that arrest?

A. I was found not guilty by Judge McDonna in state court.

Q. Were you arrested again after that?

A. Yes, I was.

Q. What were you arrested for at that time?

A. Possession and attempt. Same thing basically.

Q. Same kind of drugs?

A. Yeah.

Q. Were any of the officers who were involved in that case also involved in this case?

A. Yes, they were.

Q. Which officers?

A. Brock Covington, Norman Klahre, and the other two gentlemen, I don't know their names.

Q. What was the result of that arrest?

A. I pled guilty.

*   *   *

Q. Do you know a woman by the name of Mia Covington?

A. Yes, I do.

Q. When did you first meet her?

A. It was April, about two weeks before my birthday. And we would go out on the weekends to a bar called the Red Onion, and they had Karaoke, you know, people get up and sing and have fun or whatever. And I just came home from doing a long stretch and I met a young lady that we had eye contact and we kind of hit it off, you know, after every weekend we would meet up there and have a few drinks, a few beers, have a few laughs, we would sing and just have fun.

Q. Now, what year was that?

A. That was 1999 when I first got out, the summer of '99.

Q. And your relationship with Mia Covington lasted for what period of time?

A. About six months maybe. Maybe six months to a year off

and on.

Q. Were the two of you involved in a romantic way?

A. Not a -- I would say sexual way.

Q. Sexual way?

A. Sexual way.

Q. During this period of time you were involved with Ms. Covington, what was her marital status?

A. Well, we had talked and I had -- I had told her about my bad experiences, she was telling me about hers. I had told her that I was, you know -- at that period of time I think I was like three years happily divorced, and she was telling me about she was going to get a divorce, but she was still married, but they were separated.

Q. Did she tell you who her husband was?

A. No, she never told me who he was.

Q. Did you at some point learn who her husband was?

A. Yes, she did.

Q. Who was that?

A. Brock Covington.

Q. One of the police officers who testified against you?

A. Correct.

Q. How did you learn he was the estranged husband of Mia Covington?

A. When I would come home from work I was getting pulled over: I ran a stop sign, I didn't have my turn signal on, I crossed a yellow line. And I was just being harassed by this guy and I didn't understand why and I didn't know who he was. And then one day we went to the Red Onion and her family was there and I asked him about this guy, do they know a guy named Brock Covington from the North Side -- no, I didn't say Brock

Covington, I just said Covington because at the time I didn't
know his first name. They were like, you know, can you
describe him to us. When I described him to them, I heard
somebody whisper, one of her cousins saying that sounds like
Brock. And then I put two and two together with Mia's last
name and his last name, and her cousin said, that's her
husband. And then it just registered, I said, oh, no wonder
why I'm being harassed.

Q. Now, did you have any verbal confrontations with
Officer Covington?

A. Not physical, but later on I did. Not physical, but
verbally. But at the beginning I was just being harassed by
hisself at first and then his colleagues.

Q. What was the verbal confrontation?

A. You know, that they was going to get my monkey ass, you
know what I mean, I think I'm sick, you know, who am I to be
driving this and driving that. Just little, you know, remarks
off the side, they didn't mean that much to me.

Doc. No. 198, pp. 93-97.

When cross-examined by the prosecution concerning his relationship with Mia

Covington, Mr. Green testified as follows:

Q. Now, you also mentioned that you had a sexual
relationship with Mia Covington, is that correct?

A. Correct.

Q. In your OMI statement you also discussed your
relationship with Ms. Covington. Didn't you say --

            MR. LEVENSON: Excuse me, page, please.
            MR. BRADY: Page 5, I am sorry.

BY MR. BRADY:
Q. Didn't you say, quote, we never, you know, got together
as a man or woman or nothing like that?

A. Correct. Meaning that was my woman, I was her man. It
was just a sexual -- it was -- we had sex twice.

Q. I see.

A. Twice.

Q. So it was a sexual relationship?

A. That's it.

Q. When you first met Ms. Covington, according to your testimony, she was still married, is that right?

A. Correct.

Id. at pp.139-140.

The testimony proffered by Mr. Lee and Mr. Brown at the Section 2255 hearing provided the same general information with respect to Mr. Green and Ms. Covington. Mr. Lee and Mr. Brown confirmed that they had seen Mr. Green sitting with Ms. Covington in the same bars that Mr. Green mentioned when he testified during trial. Mr. Green's testimony provided greater detail concerning the nature of the alleged relationship between himself and Ms. Covington, but it appears from the trial transcript that Mr. Green himself struggled somewhat to define the nature of his relationship with Ms. Covington. The only person who could confirm the nature of the relationship, was Ms. Covington, and she did not testify at either the trial or the Section 2255 hearing.

In addition, Mr. Green's trial testimony did more than just recount the relationship he had with Ms. Covington. He also testified that the police officers in this case planted a handgun and drugs on him in order to frame him for the crimes with which he was charged in retaliation for his relationship with Ms. Covington. The "frame-up" became the pinnacle of Mr. Green's defense during this trial. His trial testimony in this regard is as follows:

Q. What happened when you were outside the bar?

A. They put me up, placed me up right against the wall next to Ficklin's kitchen window, just on the outside of Ficklin's, and had me in handcuffs.

Q. And your hands were cuffed behind your back?

A. Correct.

Q. What happened at that point?

A. They just was going to another search, like patting me down.

Q. Did anybody do anything with the gun?

A. Yeah, Officer Klahre, he took the bullet out the chambers and took the clip out, like popped the clip out, and while I am standing there they got my keys, they got the cell phones, they got the money. He asked me was I right-handed or left-handed. I said, why? Why do you want to know if I'm right-handed or left-handed? He said, because we are not going to be responsible for your belongings and I had to sign them off for somebody. So it made sense to me. I said I was right-handed.

So he said, you know, it's April, how did he put it, he said April's gone and you're still a fool. I didn't understand what he meant by that until he had the gun by the barrel and was trying to place that gun with the handle in my hand, in my right hand.

Q. And your hand was in cuffs at that point?

A. Correct.

Q. Was he able to place the gun in your hand?

A. I felt the steel, but I was trying to fight him – not fight him fight him, but I was trying to twist, there wasn't nobody to holler to, nobody to scream to. But what could I do, I was surrounded by four police officers.

*    *    *

Q. Now, did anything else happen?

A. Yes. While I was standing there, Klahre -- I think

26

Klahre had mentioned, keep searching him, like that. And that's when Officer Covington went to the trunk of the blue Impala and brought a dark bag out and brought it over to the windowsill. And I turned around and looked and in my mind I was just like, no, they're not, like that to myself. And he had a Crown Royal bag, you know what the Crown Royal drink comes in, it was a dark Crown Royal bag, the purple bag with Crown Royal on it.

Q. And what did he do with that bag?

A. He went inside and took some plastic bag out, some type of plastic bag out.

Q. Could you see what was in that bag?

A. Not really, just -- I didn't know what was -- I knew what they was getting ready to do because they told me they was going to get me, so I already knew what it was.

Q. So what happened?

A. He came over and shoved it down my pants and told them, search him, search him again. The guy with the blonde hair start going down in my pants. And stuff start falling out the bottom of my leg, you know, because it wouldn't hold because I had on some blue and white Hanes boxers and it wouldn't hold. So stuff start falling down on the ground. So they had to bend over and start picking stuff up off the ground.

Q. What were these items?

A. It looked like baggies of a white substance.

Q. What happened after that?

A. After that he had called -- he had called for a wagon. Then Klahre mumbled to me, I told you I was going to get your monkey ass, like that.

\*   \*   \*

Q. When they got you to the Allegheny County Jail, who searched you there?

A. The same officers.

27

Q. Did they find anything at that point?

A. Yes, sir.

Q. What did they find?

A. A film container.

Q. Do you have any idea where that came from?

A. Yeah, he left it in my pants. There wasn't nothing I could do about it. I tried to explain to the officer what was going on. He told me to be quiet, he said, all I am here for is to transport you and that was it.

Q. Let's back up a little bit. You said he left it in your pants. Who are you referring to?

A. Covington.

Q. Officer Covington put this film canister in your pants?

A. Yeah, and told them to search me again when they got me downtown.

Q. You said you tried to explain this to the officer. Which officer did you try to explain that to?

A. The transporting officer.

Q. Would that be the officer who testified yesterday?

A. Correct.

Q. Officer Boch?

A. I guess. I can't really remember them guys, them guy's faces, because I never had any run-ins with them before.

\*    \*    \*

Q. Now, on February 2nd of 2005 you had an appointment with Dr. Kush at his office at West Penn Hospital, is that correct?

A. Correct.

Q. This was one of those follow-up visits after your heart surgery?

A. Correct.

Q. Do you recall what time you arrived at his office?

A. I called because I wasn't sure about my appointment, so I called and one of the nurses told me that I could come in now, you know, it was around 12:30, she said, if you can make it by 1 o'clock or something like that. So I said, okay. So I got a young lady to drive me over there and I went in through the main entrance, which is -- Dr. Kush's office sits right off the main entrance. As soon as you go through the door, you make a right and his office is right there.

Q. You had a briefcase with you?

A. Correct.

Q. That's been described as a medical briefcase?

A. Correct.

Q. What was in the briefcase?

A. Tons of medicine. Like 15 different pills, I was taking my breathing machine, my asthma pumps, things, little gadgets the doctors gave me to increase my breathing, stuff like that.

Q. In addition to that, did you have any illegal controlled substances on you at that time?

A. No, I didn't.

Q. After going into the doctor's office, were you placed in an examining room?

A. Yes, I was.

Q. By yourself?

A. Yes, I was.

Q. While you were in the examining room were you arrested?

A. Yes, I was.

Q. What happened?

A. Basically I was sitting in the room and I was talking on my phone and the nurse came in and asked me what doctor I wanted to see. I told them I would like to see my main doctor, Dr. Kush. She said he was with another patient at the time. So I said, okay. I'm sitting there and I am talking on my phone, you know, and the door was shut. And I'm sitting there and, boom, I just heard this loud noise and at least eight police came in with their guns out.

Q. I assume you were surprised?

A. Yeah.

Q. Then what happened?

A. I'm sitting there on the bed. The one gentleman, white gentleman, I can't think of his name, told me I was under arrest. Asked me did I have any guns or drugs or anything of that nature. I told him, no. You know, he said, okay, we going to do a pat-down. I said, you're welcome to it. They patted me down and everything.

I asked him kindly would they take my handcuffs off me and handcuff me to the front because they were stretching me chest and I was hurting because I was freshly healing off my surgery.

Q. And did they find anything during this search?

A. No.

Q. At any point were you told that they had discovered controlled substances on you?

A. Yes.

Q. When was that?

A. That was after Officer Green came in the room.

Q. Now, the room you are referring to, was that the examining room?

A. Correct.

Q. Detective Green came in?

A. Yeah, he came in last.

Q. Who was in there with the two of you?

A. It was basically -- at the beginning it was like all of them, they was just like I guess securing the scene or whatever. Once they seen I was no danger to them or had no weapons of no sort, it was just a little cluttered in the room, so they was hot, they was all talking about how hot it was. So they all went out in the hallway.

Q. So were you alone in the examining room with Detective Green?

A. For a short period of time.

Q. Like what, like how long, five minutes?

A. Maybe that.

Q. What was the conversation between the two of you?

A. He started out telling me, you know, when you fuck with one of us, you fuck with all of us. He said, you shouldn't have did that to my boy Brock.

Q. Did he say what he was talking about?

A. Well, he didn't go into detail about it, but I already knew what he was talking about.

Q. What was he talking about?

A. He was talking about his wife.

Q. Whose wife?

A. Brock Covington's.

Q. That would be Mia?

A. Correct.

Q. Was there any other conversation between the two of you?

A. Yes, there was.

Q. What was that?

A. He was like, like damn, you know, what's all that over there in the briefcase, can I look at it. I said, you know, help yourself. He said -- I told him there wasn't nothing but prescribed medicine from my doctor. And he spun around, he had a white and black checkered jacket on with some black pants and he introduced himself as Agent Green. And he spun around and took some blue latex gloves out of his coat, out of his coat pocket like right here and put his gloves on. I was like, I mean, they already searched me and everything, why is he doing that to go check my medicine out.

Q. Okay. Was that the end of the conversation between the two of you?

A. No.

Q. What further occurred?

A. He came back to me and he said, you know, we are going to cut to the chase, he said, you know, you help us, we'll help you.

Q. What did he mean by that?

A. He said, you know, the stuff that he had had in his hand, he spun around and had two containers. I just looked at him. He was like, deja vu all over again, you know, you shouldn't fuck with my boy Brock like that.

Q. That was the end of your conversation with him?

A. No, it went on.

Q. About what?

A. He had then -- he was like, you know, if that had been my woman, you know, or my wife, I would have handcuffed you and dragged you to the woods and cut your thing off and stuck it in your mouth and buried you so deep the maggots wouldn't get you.

Q. After that you were placed in custody, is that correct?

A. I was already in custody.

Doc. no. 128, 108-118, 121-126.

In addition to the trial testimony of Mr. Green, the police officers were asked about the alleged relationship between Mr. Green and Ms. Covington.   They were also questioned concerning Mr. Green's claim that they "framed" him by planting a gun and drugs on his person on the night in question.   Their trial testimony on these issues was as follows:

### 2. Mr. Norman Khlare (police officer) – direct examination

Q. Turning your attention to the morning of July 22, 2004 at, approximately, 12:50 a.m., were you working that morning?

A. Yes, I was.

Q. Who were you working with?

A. Myself, Detective Covington, Detective Wydra, and Detective Novakowski.

Q. Were you in a marked police car?

A. No. Unmarked.

Q. Were you in uniform or plain clothes?

A.  Plain clothes.

Q. How were you seated in the car that you were traveling in?

A. I was the front passenger.

Q. Who was driving?

A. Detective Covington.

Q. And what part of the street were you patrolling that evening?

A. We were in the Uptown area, which is, Uptown is considered like the 1100 block of Fifth Avenue to about the 700 block of Fifth Avenue towards town.

Doc. No. 176, pp. 32- 33. When cross-examined by Mr. Green's attorney, the

police officer stated as follows:

Q. Now, you mentioned that you had arrested Clarence on a prior occasion?

A. That is correct.

Q. At that time, one of the other officers on that arrest was Detective Brock Covington?

A. That is correct.

Q. He was likewise with you on the evening of July 22, 2004?

A. Yes.

Q. And you knew as of July 22, 2004 that there was bad blood between Clarence Green and Officer Covington?

A. There was at first. But after, after the trial, after the first trial, it was over.

Q. Now, when you say, there was at first, what do you mean?

A. That means that Clarence and Brock didn't get along.

Q. They didn't get along because Clarence had been having a relationship with Officer Covington's estranged wife; is that correct?

A. That's incorrect.

Q. That is not correct?

A. That is incorrect.

Q. That is incorrect. Why was it that there was difficulty between Officer Covington and Mr. Green?

A. Because Clarence Green had approached -- this is all hearsay. I'm just getting this third party.

Q. I am asking for it.

A. Clarence Green had approached Brock's ex-wife and told her to say that they were having a relationship so he would have a motive on getting out of the last trial, to say we planted evidence on him.

Q. And somebody else told you that? That isn't something that you heard?

A. Yes. That Brock's ex-wife told Brock and Brock told me.

Q. And was there any indication as to whether or not Mr. Green even knew Brock's ex-wife?

A. I am not sure.

Q. But your information was that he had asked her to lie for him?

A. Basically, yes.

Q. So that he could get out of the charge?

A. Out of that last arrest we got him on; yes.

Q. That's the case where he was found not guilty?

A. No. He was found guilty. He pled.

Q. The one that he pled guilty. It was the case before that he was found not guilty?

A. We only arrested him once.

Id. at pp 63-65.

Upon redirect the police officer stated:

Q. In that 2000 case, the defendant pled guilty; isn't that correct?

A. That is correct.

Q. And this was after you had testified the defendant had contacted Mr. Covington's wife to testify on his behalf?

A. That is correct.

Q. She refused?

A. That is correct.

Q. Because she said she wouldn't lie for the defendant?

A. That is correct.

Q. So, the defendant wants to use this same defense before in a previous case?

A. Yes, he has.

Q. In that case, he pled guilty?

A. Yes, he did.

Q. Cadet Klahre, as you are aware, the defendant alleges you conspired to plant evidence on him. Did you plant evidence on him that night?

A. No, I didn't.

Q. If you did, what would have happened?

A. I would be arrested. I would go to jail. I would lose my job. My kids and wife wouldn't have anybody to support them.

Q. And you had arrested drug dealers like Clarence Green on many occasions in the past?

A. That is correct.

Q. You said you have been involved in over a thousand arrests?

A. Yes, I have.

Q. Is any defendant worth you losing your job or career over?

A. No, sir. It's not.

Id. at p.70-71.

### 3. Mr. Brock Covington (police officer) – Cross-examination

Q. Detective Covington, prior to July 22, of 2004, you knew Mr. Green; is that correct?

A. Yes.

Q. You had been involved in other cases with him?

A. Correct.

Q. You had arrested him several times prior to this occasion?

A. Twice.

Q. Twice. And so, this would be the third time that you were involved in arresting Mr. Green?

A. That's correct.

Q. And can you recall when the other two arrests took place?

A. When?

Q. Yes. The proximate year?

A. The first one, I believe, was December of 2000. Second one, I am not sure when it was. It was after that.

Q. And you are telling us that when you initially saw him standing on the corner of Fifth and Pride on July 22, 2004,

at ten of one in the morning, you didn't recognize him?

A. Not initially. His back was towards me.

Q. And when was it that it first occurred to you that this was Clarence Green?

A. Probably after we got beside him.

Q. That would be a matter of a second?

A. Yes.

Q. And now, did you say his back was to you as you were approaching him?

A. Yes.

Q. So, you couldn't see his face at that point?

A. No.

Q. Now, at some point, was Mr. Green involved in a relationship with your estranged wife, Mia Covington?

A. No. Well, according to her, no.

Q. Did you ever have any discussions or confrontations with Mr. Green about whether he was involved in a relationship with your estranged wife?

> MR. BRADY: Objection, Your Honor. This is all hearsay.
> THE COURT: Overruled. You may continue. We're on cross-examination.

A. Never had a conversation with Mr. Green about my ex-wife. Never.

Q. Never?

A. Ever.

Q. Did you ever threaten Mr. Green that you would arrest him on any occasion that you could?

A. No.

Q. Subsequent to this July 22 arrest, you have seen
Mr. Green; is that correct?

A. Since July 22?

Q. Yes.

A. Yes.

Q. You have seen him in church on a number of occasions?

A. Yes. He started going to the same church that I go to
probably about five or six months ago, coincidently.

Q. And on several of those occasions, you have gone over,
given him a hug?

A. Yes.

Q. Why is that?

A. Well, because I'm born-again Christian and I believe in
love. And despite, despite all the lies that -- and all the
things that he is trying to convince the Court to believe, I
still don't.

Q. You still love him?

A. Yes, sir.

Q. You told him that?

A. Yes.

Q. On how many occasions?

A. I told him once. But exact words was, you know what,
Clarence? I love you. But, more importantly, Jesus Christ
loves you.

Q. How long ago was that?

A. Probably somewhere around two months, I guess.

Doc. No. 176, p. 115- 117.

On redirect, Detective Covington testified as follows:

Q. Mr. Levenson asked you a series of questions about your ex-wife. To your knowledge, has your ex-wife dated or had a relationship with the defendant?

A. No.

Q. Now, Mr. Levenson asked you this is not the first time that you encountered the defendant; isn't that correct?

A. This is not the first time.

Q. The July 22 arrest was not the first time you had encountered the defendant?

A. That's correct. It would have been December of 2000, I believe.

Q. And in December of 2000, that was the first time you arrested Clarence Green; is that correct?

A. That's correct.

Q. Had you met him previous to that?

A. No. Never heard of him previous to that.

Q. Excuse me?

A. Never heard of him previous to that.

Q. In fact, this case is not the first the time that he has made these allegations against you; isn't that correct?

A. That's correct. He made the same allegations in the first case.

\*   \*   \*

Q. Now, again, did you have any information that the defendant would be at that location that evening?

A. No.

Q. Did you instruct your team to look for the defendant?

A. No.

Q. At any time, did you instruct members of your team that if the defendant happened to be found by you, that you would take whatever evidence you had in your possession and plant it on him?

A. No. If I did, I should be in federal prison.

Q. If you planted evidence on the defendant, would you lose your job?

A. Lose more than my job.

Q And is this defendant or any defendant worth losing your job or career?

A. No.

Id. at p. 115- 117, 124-125.

Given the totality of all this testimony presented to the jury during trial, the Court finds that Mr. Green's counsel elicited testimony from various witnesses, as well as Mr. Green himself, concerning the relationship between Mr. Green and Ms. Covington. The Court further finds that the additional testimony concerning the alleged relationship proffered by Mr. Lee and Mr. Brown at the Section 2255 hearing, if proffered at trial would have been cumulative. Mr. Green's counsel's decision not to present the testimony of Mr. Lee and Mr. Brown did not prejudice the Defendant at trial. Thus, the testimony of Mr. Lee and Mr. Brown offers no new evidence that the jury did not already have at its disposal during the trial.

   **e.**  **Mr. Roy Dean and Mr. Richard Donnelly** were called to testify on behalf of Mr. Green at the Section 2255 hearing. Mr. Dean was employed by the City of Pittsburgh Office of Municipal Investigations. He testified that Mr. Green filed a citizen's

complaint against police officers Klahre and Covington in 2004. The allegations were that the officers planted a handgun and drugs on him during his arrest.

Mr. Richard Donnelly testified that he was employed as a probation officer for Allegheny County. He testified that Mr. Green told him that one of the arresting officers in the instant matter, had issues with Mr. Green over a female.

Again, this Court finds that the testimony of Mr. Dean and Mr. Donnelly to be duplicative of identical testimony which was put before the jury by Mr. Green's trial counsel through Mr. Green, as well other trial witnesses – namely Ms. Massengill and Ms. Dickey. Thus, this Court finds that Mr. Dean's and Mr. Donnelly's testimony would have been cumulative and would have offered the jury no new evidence or information they did not already possess.


**2.** Mr. Green made informed decisions and chose to follow his trial attorney's advice during the trial of this matter. The advice of Mr. Green's trial counsel was sound.

During the Section 2255 hearing, Mr. Stanton Levenson, Mr. Green's trial counsel, testified that although he could not recall specifics concerning individual witnesses, he did recall receiving photograph(s) of Ms. Covington and Mr. Green together, but he could not recall how many photograph(s) Mr. Green gave him. Doc. No. 220, p. 104. He testified that any photo or photos would be in his file, and he further testified that he had turned the file over to the Public Defender's Office "a number of years ago." Id. Mr. Levenson testified that he could not recall one way or the other whether the photo or photos were to be used as evidence at the trial, but he conceded that it could have been helpful to the defense, but he could not recall if he proffered them during trial. Id. at p. 104, 119.

However, Mr. Levenson did recall interviewing Ms. Covington before the trial and she denied the existence of relationship between her and Mr. Green. Id. at p. 113. He testified that he opted not to put Ms. Covington on the witness stand during the trial and stated, "[i]t would have been extraordinarily foolish to put her on the stand, knowing that she was going to deny having a relationship." Id. at p. 114. He reiterated this same sentiment again when he testified as follows: "All I knew was [Ms. Covington] would come into court and testify that she never had the relationship, so there was no reason to call her." Id. at p. 123.

Mr. Levenson testified that it is his practice to meet with his clients before trial to prepare them for the trial and at some point in time he advises his clients (including Mr. Green) that they have the right to testify. Id. at p. 115. Mr. Levenson further testified that no matter what he recommends concerning whether the client should testify, he tells his clients (including Mr. Green) that he will do whatever they want because it is their case. Id. at p. 116.

In addition, Mr. Levenson stated that it is his practice to discuss "every question" he will ask a defendant while he is on the witness stand, and further claimed it is his "practice on direct examination to write it all out and review it with the client." Id. at p. 117. Thus, Mr. Levenson testified that he informed Mr. Green that he would be asking Mr. Green about this prior arrests and "run-ins" with the police officers at issue in the instant case while Mr. Green was on the witness stand. Id. at p. 118.

Both Mr. Levenson and Mr. Green testified at the Section 2255 hearing that Mr. Green understood that the defense trial strategy required Mr. Green to provide the jury with the information concerning: (1) his past history with the arresting officers (which would include his arrests and convictions), (2) his past history with Ms. Covington, as well as (3) details of this

arrest, including the identities of the police officers planted evidence on him in retaliation for his alleged relationship with Ms. Covington. Id. at p. 88, 92, 122.

Mr. Levenson was also able to recall that Mr. Green used his brother's name and social security number to obtain medical treatment but could not recall if he objected to the introduction of such evidence. Id. at p. 106. However, it is clear from the trial transcript that Mr. Green had to discuss some of this medical treatment, because purportedly during a follow-up medical visit another police officer allegedly planted additional drugs on Mr. Green and allegedly told Mr. Green that he was doing so in retaliation for Mr. Green having a relationship with Ms. Covington. Id. at p. 121-126.

Also, during the Section 2255 hearing, Mr. Levenson testified that he was sure there was reason he asked Officer Klahre about his knowledge regarding the relationship between Ms. Covington and Mr. Green, but he could not recall what that reason was. Id. at pp. 108-109. On cross-examination, Mr. Levenson admitted that his defense theory was that the police were lying and that they framed Mr. Green. Id. at p. 118.

This Court finds that Mr. Green's prior arrests by the officers who conducted this arrest was an important component of his defense in this case which rested upon the jury believing he was framed in retaliation for having a relationship with the estranged wife of one of the arresting officers. Thus, this Court finds that the introduction of his prior arrests was not a legal error. Moreover, based on testimony proffered by both Mr. Green and Mr. Levenson at the Section 2255 hearing, the Court finds that Mr. Green discussed these matters with Mr. Levenson, his trial counsel, prior to testifying on his own behalf in this regard.

## V.     Conclusions of Law

1.     Mr. Green's trial counsel conducted a reasonable investigation. Under the two-prong *Strickland* analysis, Mr. Green had to show that his trial counsel's performance was deficient, and he was prejudiced by it. Mr. Green does not meet either prong of this test.

As noted above, Mr. Levenson was the sole investigator and he chose select witnesses to provide testimony during trial which supported Mr. Green's theory that he was framed for having an alleged relationship with Ms. Covington. Each of the witnesses who testified at the Section 2255 evidentiary hearing provided the same testimony that the jury heard from other witnesses that Mr. Levenson procured, and thus, the "new" testimony provided at the hearing was not new information; rather, it was new people providing duplicative testimony.

In addition, the only other evidence that was provided at the Section 2255 hearing was a photograph which depicted Mr. Green, Ms. Covington, and other individuals standing as group and posing for the camera. Even though Mr. Levenson could not offer any reason why he would not have offered the photograph as evidence (although he testified that he had to have had one), the Court concludes that this photograph of many people (including Mr. Green and Ms. Covington) does not prove the two of them had a relationship, and the totality of the evidence presented against Mr. Green at the trial would have outweighed any effect that this group photograph may have had on a jury. Moreover, at the Section 2255 hearing, Mr. Levenson testified that he recalled interviewing Ms. Covington before trial, and she denied that she had a relationship of any kind with Mr. Green. The information Ms. Covington provided to Mr. Levenson mirrored the testimony supplied by two police officers during trial.

**2.**  Mr. Green's trial counsel did not err in failing to object to, and permitting the admission of, evidence of Mr. Green's other crimes/convictions, Mr. Green's fugitive status, and the fraudulent use of his brother's identification.  During the jury trial, Mr. Green admitted on direct examination that he had used his brother's identification to obtain medical treatment because he was due in court and knew he would miss the court appointment.  He therefore used his brother's name to obtain medical treatment so that he would not be located by the authorities as quickly.  Also, as noted above, Mr. Green testified during the trial that additional drugs were "planted" in his briefcase by a police officer while Mr. Green was waiting to be seen by a medical professional after his heart surgery.  Mr. Green testified that while the police officer was busy planting this set of drugs he was told by the policeman that it was (again) because of his relationship with Ms. Covington.  Thus, this testimony furthered Mr. Green's defense theory that he was framed by the police because of his relationship with Ms. Covington.

With respect to Mr. Green's counsel's decision to allow testimony of Mr. Green's prior arrests and convictions, F.R.E. 404(b) provides that evidence of "other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith . . . [but] may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b).  The United States Court of Appeals for the Third Circuit recognizes that Rule 404(b) is "a rule of inclusion rather than exclusion."  *United States v. Givan*, 320 F.3d 452, 460 (3d Cir. 2003) (citing *United States v. Jemal*, 26 F.3d 1267, 1272 (3d Cir. 1994)).  In general, the Court of Appeals for the Third Circuit favors the admission of Rule 404(b) evidence when it is relevant for any purpose other than to show the defendant's propensity to commit the charged offense. *United States v. Daraio*, 445 F.3d 253, 263 (3d Cir. 2006).

Here, Mr. Green testified about his prior arrests and convictions to establish that he had a history with at least two of the four arresting officers in this case. His history with the police officers was an important component to his "frame-up" defense. Per Mr. Green's trial testimony, at least one of the officers had been "harassing" Mr. Green in between his arrests, and it was this harassment that led Mr. Green to make inquiries and discover that Ms. Covington was the estranged wife of the harassing police officer. Thus, this testimony was yet another building block to his defense.

**3.** Mr. Green's trial counsel did not err in procuring alleged hearsay testimony which rebutted Mr. Green's defense that the police had a motive to frame him. As noted above, Mr. Levenson elicited testimony from Officer Klahre whereby Officer Klahre testified that Officer Covington told him that Mr. Green had approached Ms. Covington (Officer Covington's estranged wife) and told her to say that she was having a relationship with Mr. Green, so he would have a defense to the charges he faced in a prior trial. In addition, Officer Covington himself stated that his estranged wife denied having a relationship with Mr. Green.

This elicited testimony was consistent with Mr. Green's overall defense theory/strategy which required him to convince the jury that the police officers were liars. Mr. Green's defense theory required him to convince the jury that the police officers had lied about: (1) Mr. Green having drugs on the night in question – the defense theory was that the police planted them; and (2) Mr. Green possessing a gun on the night in question – the defense theory was that the police planted it. The defense theory was that the police made up these lies to protect the fact that they planted evidence, and they planted evidence to frame Mr. Green for having a relationship with Ms. Covington. Knowing that Ms. Covington could not be called upon to testify on Mr. Green's

behalf, (given that she personally told Mr. Levenson during his interview with her that she had no relationship with Mr. Green), and given that he was trying to show the police officers were lying, the Court concludes that Mr. Levenson's decision to ask the police officers about the alleged relationship was not error.

As noted above, Mr. Green must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Hankerson*, 496 F.3d at 310. To rebut this presumption, Mr. Green "must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel, or (2) that the actions could never be considered part of a sound strategy." *Thomas v. Varner*, 428 F.3d 491, 499 (3d Cir. 2005). Here, Mr. Green again fails to meet his burden.

In addition, under the prejudice prong of the *Strickland* test, Mr. Green had to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is 'a probability sufficient to undermine confidence in the outcome.'" *Hankerson*, 496 F.3d at 310 (quoting *Strickland*, 466 U.S. at 694). Given the totality of all the testimony and evidence provided during the trial, this Court concludes that Mr. Green's counsel's eliciting contrary testimony concerning the existence of a relationship with Ms. Covington does not meet the prejudice prong of *Strickland*.

 

**4.** The Court concludes that Mr. Levenson's failure to challenge this Court's jury instruction on 18 U.S.C. § 924(c) was not an error for which a new trial can be granted by this Court. This Court's jury instruction reiterated Count Three of the superseding indictment as follows:

> For you to find the Defendant guilty of the firearms offense charged in Count 3 of the superseding indictment, you must be convinced the Government has proved each of the following essential elements beyond a reasonable doubt:
>
> First, that the Defendant committed the drug trafficking crime in Counts -- charged in Counts 1 and/or 2 of the indictment.
>
> Second, that Defendant knowingly carried a firearm during and in relation to the drug trafficking crime charged in Counts 1 and/or 2 of the indictment. Or that he possessed a firearm in furtherance of the drug trafficking crime charged in Counts 1 and/or 2 of the indictment.

Doc. No. 128, p. 177-178.

Mr. Green claims that his trial counsel's failure to challenge this charge as "duplicitous" constitutes ineffective assistance of counsel. However, this Court concludes that the alleged duplicitous nature of the jury charge is a legal challenge which could and should have been raised by his appellate counsel (the Office of the Public Defender) on direct appeal to the United States Court of Appeals for the Third Circuit. This is not a fact-based or evidentiary issue which may be raised here as part of Mr. Green's Section 2255 claims.

Moreover, Mr. Green's attempt to raise this issue before this Court as a habeas claim is misplaced. See, *United States v. Cepero*, 224 F.3d 256, 267 (3d Cir. 2000) (abrogated on other grounds by *Gonzalez v. Thaler*, 132 S. Ct. 641 (2012)) ("Section 2255 petitions are not substitutes for direct appeals and serve only to protect a defendant from a violation of the constitution or from a statutory defect so fundamental that a complete miscarriage of justice has occurred."); *see also Bousley v. United States*, 523 U.S. 614, 622, (1998) (Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.').

In sum, the Court concludes that Mr. Green failed to raise this "duplicitous jury charge" issue – a purely legal issue – on appeal. The Court further concludes that Mr. Green failed to demonstrate either "cause and actual prejudice," or that he is "actually innocent" during this Section 2255 hearing. Thus, this "duplicitous charge" cannot be raised here as a habeas claim. Accordingly, this Court lacks jurisdiction to hear this claim and thus declines to grant Mr. Green a new trial on this ground.

5. The Court also concludes that the alleged "accumulated prejudice" of each of the aforementioned ineffective counsel claims does not rise to the level described in *Strickland*. As to all of the preceding grounds, the Court has found that there is no prejudice as defined by *Strickland*. Accordingly, the "cumulative effect" holds no sway given that there is no prejudice evidence on any other ground.

**VI. Conclusion**

For the foregoing reasons, this Court will **DENY** the Petitioner's Motion to Vacate, Set Aside or Correct a Sentence By a Person in Federal Custody pursuant to 28 U.S.C. § 2255. See Doc. No. 134 at 04-cr-233. An appropriate Order follows.

<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge

cc:     All ECF Listed Counsel of Record